IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID HUNT, | ) | CASE NO. 5:17-cv-02089 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff David Hunt ("Plaintiff" or "Hunt") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his application for

Disability Insurance Benefits ("DIB").  This Court has jurisdiction pursuant to 42 U.S.C. §

405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and

Recommendation pursuant to Local Rule 72.2.

For the reasons explained herein, the undersigned recommends that the Court **AFFIRM**

the Commissioner's decision.

## I.  Procedural History

Hunt protectively filed[1] an application for DIB on September 9, 2014, alleging a

disability onset date of February 28, 2013.  Tr. 10, 162-168, 176.  He alleged disability due to

bipolar disorder, anxiety, fatigue/exhaustion, social issues, depression and an inability to

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 9/24/2018).

maintain function.  Tr. 99, 106.   After initial denial by the state agency (Tr. 99-102) and denial

upon reconsideration (Tr. 106-112), Hunt requested a hearing (Tr. 113-115).  A hearing was held

before Administrative Law Judge Reuben Sheperd ("ALJ") on October 26, 2016.  Tr. 23-75.

In his November 17, 2016, decision (Tr. 7-22), the ALJ determined that Hunt had not

been under a disability from February 28, 2013, through September 30, 2016, the date last

insured.  Tr. 10, 18.  Hunt requested review of the ALJ's decision by the Appeals Council.  Tr.

160-161.  On September 6, 2017, the Appeals Council denied Hunt's request for review, making

the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.      Personal, educational, and vocational evidence

Hunt was born in 1973.  Tr. 31, 162, 176.  At the time of the hearing, Hunt lived with his

aunt in a house that he had resided in for six years.  Tr. 31.  Hunt graduated from high school.

Tr. 32.  He tried attending both college and a vocational training program but ended up quitting

because he was unable to handle the programs.  Tr. 32-33.  Hunt's most recent employment was

as a furnace operator.  Tr. 33-34.  Hunt was starting to lose his temper and becoming careless

with heavy metal.  Tr. 34-35, 56-57.  Hunt ended up quitting that position because he felt it was

best for the safety of himself and others.  Tr. 35.  Prior to working as a furnace operator, Hunt

worked for a company doing inventory.  Tr. 35.  He was at that position for about three or four

months.  Tr. 35.  He was called back to the inventory job but he had started an addition on his

house and could not stop that project so he did not return to that job.  Tr. 35-36.  Hunt also

indicated he did not return to the inventory position because of his alcohol use.  Tr. 36.  Prior to

the inventory job, Hunt worked for a home construction company for about 12 years.  Tr. 37.

Because of the downturn in the housing market, Hunt was let go from the construction company job.  Tr. 38-39.

**B.     Medical evidence**

**1.     Treatment history**

Prior to his alleged onset date, Hunt saw Mark Snavely, M.D., in April 2012, with reports of depression, anhedonia, and concentration problems.[2]  Tr. 276-277.  On mental status examination, Dr. Snavely observed that Hunt was disheveled, cooperative, fidgeting, and anxious.  Tr. 277.  Hunt's speech was fluent; his affect was restricted; his thought process was circumstantial; his cognitive status was within normal limits; his insight was poor; and his judgment was fair.  Tr. 277.  Dr. Snavely diagnosed PTSD and noted that Hunt suffered from chronic mental illness.  Tr. 277.  Dr. Snavely prescribed medication.  Tr. 277.  Hunt continued to see Dr. Snavely during 2012.  Tr. 273-276.  During a May 2012 visit with Dr. Snavely, Hunt reported depression.  Tr. 275.  On mental status examination, Dr. Snavely observed that Hunt was well-groomed and his mood was better.  Tr. 275.  In September 2012, Hunt reported depression and irritability.  Tr. 273.  Dr. Snavely observed that Hunt was well-groomed, cooperative, and anxious.  Tr. 273.  Hunt had a restricted affect and circumstantial thought process.  Tr. 273.  Hunt next saw Dr. Snavely on March 4, 2013.  Tr. 272.  Hunt was quite irritable and felt that it was not possible to feel better.  Tr. 272.

Hunt started counseling with Lisa Varavvas, M.A., a therapist with Barbara Fordyce Ph.D. and Associates, on April 24, 2012.  Tr. 275, 279.  Barbara Fordyce, Ph.D., was the supervising psychologist.  Tr. 279.  Hunt relayed a long history of depression, noting he had been raised in the foster care system because of a physically abusive father and a mother who was

---

[2] Dr. Snavely's handwritten notes are difficult to read.

dependent on alcohol.  Tr. 279.  Hunt continued with counseling from April 2012 through January 2013 for a total of 20 visits.  Tr. 279.  Psychological test results were indicative of major depression with avoidant personality features, interpersonal alienation, emotional dyscontrol, and self-destructive potential.  Tr. 279.  Ms. Varavvas noted that Hunt initially made some progress and exhibited an improved mood and affect.  Tr. 279.  As Hunt proceeded with counseling, he started to become discouraged because of increasing challenges at work, a decline in the health of family members, and his inability to develop a satisfying interpersonal and social life.  Tr. 279.  Hunt stopped attending counseling in January 2013 because he felt he did not have the energy, skills or attributes necessary to follow through with treatment goals.  Tr. 279.

On March 14, 2013, Hunt was admitted to the Aultman Psychiatric Unit with his chief complaint being his struggles with alcohol over the prior nine months.  Tr. 268.  Hunt also reported a dependence on Ativan.  Tr. 268.  He reported suicidal thoughts but no plan to act on those thoughts while his mother was living.  Tr. 268.  Hunt described being depressed, getting angry often, feeling guilty/shameful, sleep disturbances, and isolating himself.  Tr. 268.  He denied difficulties with concentration, distractibility, flight of ideas, thoughtlessness, impulsivity, grandiosity, hallucinations or delusions.  Tr. 268.  On mental status examination, Hunt's hygiene was poor.  Tr. 269.  He was mostly cooperative but avoidant and guarded.  Tr. 269.  His speech was inhibited and he exhibited an agitated tone.  Tr. 269.  Hunt showed agitation in his hands/fingers, his mood was irritable and he was in poor spirits, and his affect was constricted/guarded.  Tr. 269.  Hunt's concentration appeared good and his insight and judgment were variable.  Tr. 269.  Hunt was diagnosed with MDD,[3] rule out double depression.  Tr. 269.

---

[3] It is not clear from the treatment record whether the diagnosis of MDD refers to moderate or major depressive disorder.

Hunt received two and one-half weeks of treatment and then participated in a partial hospitalization program (PHP).  Tr. 289.

Following completion of the PHP, on April 4, 2013, Hunt saw Thomas Masters, MDiv, PCC, at S. Zaidi, M.D. & Associates, Inc., and reported that he had become very dissatisfied with his job but believed that PHP had helped.  Tr. 289.  Hunt relayed that he wanted to find purpose and fulfillment in his life.  Tr. 289.  Mr. Masters encouraged Hunt to return to his job and to avoid impulsive action.  Tr. 289.  Mr. Masters diagnosed MDD, recurrent, severe.  Tr. 289.  Hunt's treatment plan included taking his medication as prescribed, following up with Dr. Zaidi and seeing his counselor in two weeks.  Tr. 289.

On May 13, 2013, Hunt saw psychiatrist Samina Zaidi.  Tr. 288.  Hunt relayed that his mood was stable and PHP was helpful.  Tr. 288.  He had not been keeping up his appointments with Mr. Masters.  Tr. 288.  Hunt was sleeping well but was intolerant and feared he was being used.  Tr. 288.  His appetite was good, his energy was fair, and he denied psychosis, suicidality, homicidality, and anxiety and reported no panic or agoraphobia.  Tr. 288.  Hunt relayed being compliant with his medications and reported no gross side effects with his current medications.  Tr. 288.  He reported having poor social skills, stating "[I] am useless in the world" and he got annoyed with people.  Tr. 288.  Dr. Zaidi diagnosed Hunt with bipolar disorder, mixed, moderate degree and post-traumatic stress disorder and noted that Hunt had avoidant, antisocial, and schizoid traits and poor esteem.  Tr. 288.  Dr. Zaidi noted that Hunt should see Mr. Masters for his avoidant, antisocial, and schizoid traits and poor esteem and follow up with Dr. Zaidi in two months.  Tr. 288.  Hunt's medications included lithium, citalopram, and lorazepam.  Tr. 288.

Hunt returned to see Ms. Varavvas on August 20, 2014, to seek guidance regarding filing for disability. Tr. 279. Hunt relayed that, in March of that year, he started having problems at work and, with his employer's support, he enrolled in a PHP for four weeks but ended up quitting his job. Tr. 279. Hunt's mother had died from cancer in July and he indicated he was feeling accountable to his aunt who had a son who had passed away. Tr. 279. While Hunt was emotionally, spiritually, and physically exhausted, he recognized the need to help and support his aunt financially and emotionally. Tr. 279. Ms. Varavvas encouraged Hunt to apply for disability since he had tried outpatient therapy, medication and a PHP to address his depression, without significant benefit. Tr. 279.

Hunt saw Dr. Zaidi on September 2, 2014. Tr. 287. Hunt relayed that his mother had passed away in July. Tr. 287. Hunt had quit his job and run out of prescriptions. Tr. 287. His primary care physician had renewed some of Hunt's medications at a lower dose which Hunt had continued until the spring of 2014. Tr. 287. Hunt was interested in filing for social security disability because he was not functioning. Tr. 287. He was not experiencing audio or visual hallucinations but he reported poor concentration, poor ability to complete tasks and a foggy mind. Tr. 287. Hunt reported being "anxious/panic" with symptoms of a tight chest and feeling down, sad and intense. Tr. 287. Dr. Zaidi observed that Hunt had trouble relating his history. Tr. 287. There was no evidence of suicidality, homicidality, or psychosis; Hunt was fairly groomed and nourished but thin; Hunt cried and became irate for no reason. Tr. 287. Dr. Zaidi observed cognitive impairment, noting that Hunt avoided eye contact. Tr. 287. Hunt's speech was deliberate and he had good insight and judgment. Tr. 287. Dr. Zaidi assessed Hunt as having no social connection with people and no social support other than living with his aunt.

Tr. 287.  Dr. Zaidi's diagnoses and the medications that he prescribed remained unchanged since

May 2013.  Tr. 287.  Dr. Zaidi indicated that Hunt "needs to be on disability[.]"  Tr. 287.

On October 14, 2014, Hunt saw Dr. Zaidi.  Tr. 285.  Hunt's chief complaints were

anxiety and fear.  Tr. 285.  Hunt relayed that he did not know where his life was going.  Tr. 285.

He had been unemployed since February 2013 and did not feel that he would accomplish

anything in this life.  Tr. 285.  His mind was foggy.  Tr. 285.  Hunt felt that he lacked a goal and

did not know who he was.  Tr. 285.  He was unable to maintain a relationship with a woman.  Tr.

285.  He had mood swings, alternating between depression and bouts of energy.  Tr. 285.  His

appetite varied and his energy was poor.  Tr. 285.  Hunt reported being very anxious and

explained that he watched a lot of television to focus his attention and not worry about his

circumstances.  Tr. 285.  Hunt denied psychosis, suicidality, and homicidality and he had no

panic or agoraphobia.  Tr. 285.  Hunt reported being compliant with his medications and denied

gross side effects from the medications.  Tr. 285.  Hunt indicated that his PTSD had not been an

issue.  Tr. 285.  Hunt's stressors included social security disability, bills, and his own health.  Tr.

285.  Dr. Zaidi observed Hunt to be in poor spirits, anxious and upset.  Tr. 285.  Hunt was fairly

groomed and nourished.  Tr. 285.  Dr. Zaidi observed no abnormal movements with the

exception of waving his arms around rapidly while talking.  Tr. 285.  Hunt was cognitively

intact.  Tr. 285.  Dr. Zaidi observed that Hunt rambled and sounded stressed.  Tr. 285.  Hunt's

insight and judgment were good.  Tr. 285.  Dr. Zaidi continued to diagnosis bipolar disorder,

mixed, moderate degree and post-traumatic stress disorder and note that Hunt had avoidant,

antisocial, and schizoid traits and poor esteem.   Tr. 285.  Dr. Zaidi's assessment was that Hunt's

bipolar disorder was not controlled.  Tr. 285.  Dr. Zaidi noted that Hunt had not been compliant

with counseling.  Tr. 285.  Dr. Zaidi recommended that Hunt continue on his current regimen and follow up in four weeks.  Tr. 286.

On December 30, 2014, Hunt underwent a diagnostic assessment by Erica Spencer, PCC, PC, at Coleman Professional Services.  Tr. 294-311.  Hunt relayed that he was applying for social security and his attorney had recommended that he get into therapy.  Tr. 294.  Hunt indicated he felt that he was a "drag on society[.]"  Tr. 294.   He reported having distant relationships with one or two individuals outside his family.  Tr. 296.  Hunt relayed that he went roller skating usually every week and, when feeling up to it, he enjoyed working in his garage. Tr. 296.  Hunt reported feelings of worthlessness and hopelessness.  Tr. 304.  He lacked motivation.  Tr. 304.  Hunt indicated he had thoughts of suicide throughout his adult life but denied any suicide attempts.  Tr. 304.  Hunt reported a lot of anxiety, worry, concern, racing thoughts, and strong anger and aggression.  Tr. 304.  Hunt avoided crowds or large groups of people; he denied frequent panic attacks.  Tr. 304.  Hunt reported having mood swings, noting that there are at least a few days when he would feel very excited and wanted to take on the world.  Tr. 305.  On mental status examination, Ms. Spencer observed that Hunt was unkempt; his demeanor was average but preoccupied; he was cooperative; his eye contact and activity were average; his speech was clear; his mood was within normal limits; he had a congruent affect; his thought process was blocked; he had average intelligence and his insight/judgment were fair.  Tr. 305-306.  Hunt requested individual counseling.  Tr. 309.  Ms. Spencer indicated that Hunt had a very hard time during the assessment because he was unsure what she was asking and he was concerned about whether his responses were the correct responses.  Tr. 309.  Ms. Spencer diagnosed bipolar disorder, NOS; panic disorder with agoraphobia; and alcohol abuse per history

8

and assessed a GAF score of 39.[4]  Tr. 309, 310.  Ms. Spencer referred Hunt for individual counseling.  Tr. 311.

On January 9, 2015, Hunt started counseling with Kelly Linger, LSW, Clinical Resident, PC, at Coleman Professional Services.  Tr. 312-314.  On mental status examination, Ms. Linger observed that Hunt was disheveled, thin, mistrustful, and withdrawn.  Tr. 312.  She noted that his eye contact was avoidant; his speech was clear; his activity was slowed; and his mood was dysthymic.  Tr. 312.  Hunt's thought process was concrete and he exhibited perseverations.  Tr. 313.  Hunt's insight and judgment were fair/poor.  Tr. 313.  He was alert, oriented and his memory was intact.  Tr. 313.  Hunt reported difficulty sleeping, feeling like he experiences panic and strong anxiety, shame, guilt, depressive symptoms, and mood swings.  Tr. 313.  He indicated that he tends to self-isolate when feeling overwhelmed.  Tr. 313.  He explained that he felt ashamed to apply for social security disability but he did not believe he could work because of his mental health concerns.  Tr. 313.  Hunt was resistant to Ms. Linger's suggestion that Hunt consider a psychiatric evaluation for possible medication management of his symptoms.  Tr. 314.

During a January 20, 2015, session with Ms. Linger, Hunt reported meeting a girl while skating and she was emailing him.  Tr. 315-317.  Hunt indicated that the situation was stressful for him because it entailed social interaction and caused him anxiety.  Tr. 315.  Hunt was mildly interested in the friendship but indicated that she would likely end the relationship once she

---

[4] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  *Id.*  With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

realized how "messed up" he was.  Tr. 317.  On mental examination, Ms. Linger observed that

Hunt was disheveled, thin, mistrustful, withdrawn, resistant, avoidant, dysthymic, his speech was

clear, his activity was slowed, his affect was congruent, his thought process was concrete with

perseverations, his insight/judgment were fair/poor, he was alert and oriented, and his memory

was intact.  Tr. 315.  Hunt was tearful and felt that things would not get better for him.  Tr. 317.

Ms. Linger suggested that Hunt write down ways in which he felt he had "fallen back" so that

they could discuss them at the next session.  Tr. 317.

     During a session with Ms. Linger the following week on January 27, 2015, Hunt

appeared more neatly groomed and brought a piece of paper with him with information he wrote

down following his prior session with Ms. Linger.  Tr. 318.  Hunt relayed that he had spent most

of the week locked in his room and that his depression was weighing him down pretty strongly.

Tr. 318.  Ms. Linger's mental status examination observations were similar to her observations

during past therapy sessions.  Tr. 318-319.  Hunt expressed distress over trying to manage his

mental health symptoms and stated he was filled with self-hatred and was not certain what he

could do differently to improve his situation.  Tr. 319.  Hunt indicated he was attached to his

aunt and did not want to burden her with his mental health problems.  Tr. 319.  Hunt continued to

resist Ms. Linger's suggestion that he consider medication as a treatment option.  Tr. 320.  Hunt

agreed to continue processing his thoughts and feelings between sessions.  Tr. 320.

     Hunt saw Ms. Linger again on February 3, 2015.  Tr. 321-323.  Hunt reported feeling

"different."  Tr. 321.  He was feeling "hyper[,]" like he was "slipping out of his skin."  Tr. 321.

Hunt reported agitated movements, nightmares, difficulty sleeping and paranoia.  Tr. 322.  He

was feeling like a burden to his aunt.  Tr. 322.  Although resistant to the idea of being on

medications, Hunt was open to a referral for a psychiatric evaluation to explore the possible

benefits of medication.  Tr. 323.   When Hunt saw Ms. Linger on February 10, 2015, Hunt

relayed that he had been writing a lot and had a lot of thoughts going on in his head.  Tr. 324.  He

was feeling better that week and reported his mood was "somewhat 'normal' – not manic, not

depressed."  Tr. 324, 325.  Hunt discussed a recent friendship that he had started to form but

expressed frustration with the difficulties he had interacting with others.  Tr. 325.  He wanted to

feel connected with others but feared rejection once people got to know the "real" him.  Tr. 325.

Ms. Linger discussed with Hunt ways to manage his illness.  Tr. 326.   During a session with Ms.

Linger on February 17, 2015, Hunt reported feeling down and struggling to interact with others

outside of limited social settings.  Tr. 327.  His friendship with a woman was not going well.  Tr.

327.  Hunt expressed strong feelings of grief and guilt over his mother's death and his perception

that he had not been able to effectively care for her when she was dying.  Tr. 328.

On February 20, 2015, Hunt saw Michael Potesta, M.D., DEA, at Coleman Professional

Services for an initial psychiatric visit.  Tr. 330-335.  Hunt relayed that he was there because his

therapist thought he should consider medication.  Tr. 330.  Hunt explained that he last saw Dr.

Zaidi in December and switched to Coleman because he had no insurance and no money.  Tr.

330.  Also, Hunt had not been on medications due to the cost.  Tr. 330.  His past medications

included lithium, citalopram, and lorazepam (Ativan).  Tr. 330. Hunt felt that his depression had

worsened since his mother passed away in July.  Tr. 330.  Hunt reported having panic attacks 2-3

times per week and having manic episodes in the past but he had not had one within the past few

months.  Tr. 330.  He denied hallucinations, paranoia, and delusions, and denied any current

PTSD symptoms.  Tr. 330.  On mental status examination, Dr. Potesta observed Hunt's

demeanor to be mistrustful but cooperative; his eye contact was poor; his speech was clear; his

mood was anxious; his affect was blunted; his thought process was logical; his thought content

11

was unremarkable; and his insight/judgment were fair.  Tr. 331-332.  Dr. Potesta diagnosed

bipolar disorder; agoraphobia with panic disorder; and alcohol abuse, unspecified, and he

assessed a GAF score of 40.  Tr. 332, 333.  Dr. Potesta started Hunt on lithium, citalopram and

vistaril and recommended that Hunt continue with counseling.  Tr. 334.  Dr. Potesta did not

continue Hunt on Ativan because Hunt did not feel it was working and he was concerned about

becoming dependent on it.  Tr. 334.

Hunt continued counseling at Coleman during 2015 and 2016.  Tr. 393-446, 472-604,

644-647, 649-668, 675-690, 692-699.  Hunt also continued medication management through

Coleman during the same period.[5]  Tr. 447-471, 605-643, 669-674.

Hunt followed up with Dr. Potesta on March 20, 2015.  Tr. 447-452.  Hunt relayed

feeling overwhelmed and he was having a difficult time going out in public.  Tr.  448.  Hunt was

considering not being on medication because he felt numb and the medication took away the

"high highs."  Tr. 448.  He denied feeling depressed but Dr. Potesta noted that he had multiple

symptoms of depression.  Tr. 448.  Hunt was interested in applying for disability and Dr. Potesta

informed Hunt that, due to his history, he felt that was reasonable and encouraged Hunt to

consider applying.  Tr.  448, 451.  Dr. Potesta continued Hunt on lithium, citalopram (at an

increased dose), and vistaril.  Tr. 451.

Hunt also saw Ms. Linger on March 20, 2015, for a counseling session.  Tr. 399.  Hunt

reported that he was "in the middle" with his moods rather than having some high moments and

he was not sure that he liked the way that felt.  Tr. 399, 400.  He had feelings of guilt and sadness

about his mother's death.  Tr. 400.  He explained that he had traveled to Myrtle Beach and felt

sad about not having his mother around to share his pictures with.  Tr. 400.  Hunt felt a "glimmer

---

[5] Dr. Potesta as well as Mary Beth Husseini, Clinical Nurse Specialist and Michelle Garrett, CNP-BC, RN, DEA, provided medication management services to Hunt.

12

of hope" after leaving his March 20, 2015, session but, when he saw Ms. Linger the following week, he indicated that the next day he felt anxiety over having felt hope.  Tr. 402.  When Hunt met with Ms. Linger on April 2, 2015, he relayed having a panic attack following an evaluation he had attended for social security, noting he was confused about questions that were asked and also surprised that the panic attack occurred after rather than prior to the evaluation.  Tr. 405.

Throughout April 2015, Hunt continued to report feeling down and anxious but remained receptive to working with Ms. Linger on his symptoms.  Tr. 409, 411, 414.  During an April 21, 2015, session with Ms. Linger, Hunt relayed that his lithium dose had been doubled and by the middle of the day he was very nauseous so he was not consistently taking his medications.  Tr. 414.  Also, Hunt did not feel that his medications were working.  Tr. 416.  Ms. Linger discussed the importance of taking medications as directed and referred him to psychiatry to address the side effects he was experiencing.  Tr. 416.  Hunt noted that he was frustrated with having been denied disability.  Tr. 415.  At a counseling session on April 28, 2015, Hunt reported feeling better since his medications were adjusted but he was still struggling with acid reflux and heartburn and was still not happy about taking medications and taking "medications to deal with medications."  Tr. 417.  Hunt reported experiencing some manic symptoms, including racing thoughts and irritation, and he was having difficulty focusing and completing tasks.  Tr. 418.

At a May 4, 2015, counseling visit, Hunt was feeling really bad.  Tr. 420.  He noted he was not taking his full dose of lithium because of stomach issues.  Tr. 420.  Hunt complained that he was having problems finishing projects and his mental struggles were leading him to anger.  Tr. 422.  During counseling sessions in May, Hunt continued to report having a difficult time with things.  Tr. 423-431.  Dr. Potesta adjusted Hunt's medications during a May 12, 2015, visit due to the lithium causing stomach issues for Hunt.  Tr. 463.  The lithium was discontinued

13

and Depakote was added in its place for mood stabilization.  Tr. 463.  During a May 26, 2015, session, Hunt relayed that his aunt noticed that he was less prone to "blowing up" over things and she was seeing improvement in his ability to regulate his moods by retreating to his room.  Tr. 431.  Hunt was working on trying to be at "peace in the moment."  Tr. 431.

Hunt saw Dr. Potesta on June 1, 2015.  Tr. 465-471.  Hunt indicated he had not been feeling depressed and had not had symptoms of mania.  Tr. 466.  Hunt's sleep had been okay.  Tr. 466.  He relayed a recent episode when he got angry and "shut down" and kept to himself for a few days.  Tr. 466.  Hunt was tolerating his medications well with no side effects noted.  Tr. 466.

During counseling sessions in June 2015, Hunt reported ups and downs and discussed that he was struggling with trying to find the right balance in life.  Tr. 432-446.  He worried about finances and not working but he was also worried about taking care of his mental health.  Tr. 445.  He felt that being able to face life at a slower pace seemed to be helping his mental state but he worried about the future.  Tr. 445.

When Hunt saw Ms. Linger on July 7, 2015, he explained that he had been feeling an "obsession" with working and an "obsession" with thinking about having a girlfriend.  Tr. 472.  His obsessions had become so burdensome he had to shut down mentally for a while.  Tr. 472.  During the counseling session, Hunt had a panic attack.  Tr. 473.  Ms. Linger noted he was tearful and emotional after the panic attack but receptive to hearing about ways to combat and cope with panic symptoms.  Tr. 474.  The following week, Hunt saw Ms. Linger and explained that he had been "touchy and irritable."  Tr. 475.  Hunt saw Nurse Husseini for a psychiatric visit on July 17, 2015.  Tr. 605-610.  Nurse Husseini continued Hunt on his medications.  Tr. 609.  On July 21, 2015, Hunt saw Ms. Linger and indicated he was concerned about changing

14

psychiatrists.  Tr. 478.  Also, he was worried because he had locked his keys in his car prior to his appointment with Ms. Linger.  Tr. 478.  He was struggling with it being the anniversary of his mother's death and was somewhat annoyed with people bringing it up.  Tr. 479.

During an August 4, 2015, counseling session, Hunt relayed that he had purchased a travel trailer and was somewhat excited about having the trailer for activities although he expressed guilt about owning or acquiring things because he was not working.  Tr. 481-482. Hunt had taken a week off from therapy and felt that doing so was a "good test" and he wanted to try to start attending therapy bi-weekly.  Tr. 484.  When Hunt saw Ms. Linger on August 18, 2015, he was struggling with depression and felt that his "negativity" was bad for others and he needed to isolate.  Tr. 486.  Hunt relayed using alcohol to relax and be "social."  Tr. 488.  Hunt also saw Nurse Husseini on August 18, 2015.  Tr. 611-616.  She noted that Hunt had no current symptoms of mania but his anxiety and depression seemed worse.  Tr. 615.  Nurse Husseini continued Hunt on citalopram, vistaril, and Depakote and she added Neurontin for Hunt's increased anxiety.  Tr. 615.  On August 26, 2015, Hunt reported that he was working on renovating his home.  Tr. 489.  There were some parts of the work that he did not enjoy which was creating stress for him.  Tr. 489.  Hunt was frustrated with his changing moods.  Tr. 490.  He had spent two days drunk and preferred the headaches, stomach problems, and feeling sick of drinking better than how he had been feeling.  Tr. 490.  Ms. Linger discussed the risks of using alcohol with the medications that Hunt was on.  Tr. 492.  Hunt indicated that he turned to drinking due to feeling overwhelmed and having a heightened awareness of "what I am and what I am not and the way the world is."  Tr. 492.

During a September 8, 2015, counseling session, Hunt reported that he was somewhat pleased with his renovations.  Tr. 493.  He had gone to a party.  Tr. 496.  He had two beers and

15

once he stopped drinking he started to feel awkward and tense.  Tr. 496.  He spoke to a woman

he had an interest in at the party.  Tr. 496.  Hunt was interested in eventually volunteering

somewhere but noted that he did not feel he was able to follow a rigid schedule.  Tr. 496.  When

Hunt saw Ms. Linger on September 22, 2015, Hunt indicated that he had been doing "too much"

and his anxiety had increased since his last session.  Tr. 497.  Hunt purchased a car by trading in

two cars.  Tr. 498.  He was frustrated because it turned out that something was not working

properly on the car he got for the trade-ins and dealing with the dealership was more than he was

comfortable handling.  Tr. 498.  Hunt felt that he was doing better at managing his anger but he

was continuing to feel frustrated with dealing with people.  Tr. 500.  During a September 29,

2015, session, Ms. Linger noted that Hunt appeared to be managing his agitation and stress more

effectively than he had in the past.  Tr. 504.  Hunt indicated that he felt he had made some

progress in reducing his mental health symptoms.  Tr. 504.   On September 30, 2015, Hunt saw

Nurse Husseini and relayed that both Ms. Linger and he felt that he had made some progress.  Tr.

617.  Hunt had been going roller skating on a weekly basis and indicated that he had recently

been able to be more social.  Tr. 617.  Nurse Husseini increased Hunt's vistaril because he had

been taking two at a time.  Tr. 617, 620.  Hunt had not started the Neurontin.  Tr. 620.

During an October 13, 2015, counseling session, Hunt explained that he was tired of

trying to figure out what was wrong with himself and he had just been trying to let his symptoms

run their course.  Tr. 510.  He was able to identify patterns and symptoms that were indicative of

cycles in his mental health.  Tr. 512.  He had taken his aunts to a casino.  Tr. 512.  He set a

budget and stuck with it.  Tr. 512.  On October 20, 2015, Hunt reported no new or pressing

stressors.  Tr. 513.  He was continuing to work on his home and enjoying the process to some

extent.  Tr. 514.  The following week, Hunt reported that the week had been crazy and his body

16

was exhausted and his mind was slow and blurry.  Tr. 517.  He had been sitting on the floor and staring in a mental blur not knowing what to do.  Tr. 518.

In November 2015, Hunt had manic and depressed episodes.  Tr. 525-526, 529-536. When experiencing a manic episode, he indicated he was trying to find a balance between productivity when manic and not burning himself out with over activity.  Tr. 526.  Hunt felt that the counseling sessions were helping him recognize the cycling of his condition and reinforce his coping strategies.  Tr. 528.

During a visit on December 8, 2015, Hunt reported that he was going to try to stop smoking.  Tr. 541.  He was nervous that trying to do so would increase his mental health symptoms.  Tr. 541.  Hunt was feeling pressured to go on a trip with his uncle to make sure that his uncle was safe.  Tr. 542.  Hunt felt he was being very productive at that time and did not want to stop working on his house because he hoped it would be done so he could "enjoy the fun stuff that happens around Christmas."  Tr. 542.  Hunt relayed that he had been able to avoid a panic attack that he felt was coming on when he was recently at a store by finding a quiet place and practicing cognitive restructuring.  Tr. 544.  The following week Hunt reported that trying to quit smoking was very stressful and he felt anger and disappointment realizing he had an apparent addiction to nicotine.  Tr. 546.  Hunt discussed facing struggles while traveling with his uncle on a cross country trip not knowing whether the feelings he was having were anger or panic.  Tr. 548.  That same month, Hunt reported having a manic episode that included problems sleeping and saying and doing things he regretted later.  Tr. 550.  On December 29, 2015, Hunt switched medication management providers and starting seeing Nurse Garrett.  Tr. 624.  Nurse Garrett increased Hunt's Depakote to help with sleep and to stabilize his mood better.  Tr. 627.  When

Hunt saw Ms. Linger on December 31, 2015, he reported he had a good holiday with his family and he was continuing to do home improvements.  Tr. 554.

Hunt continued to see Ms. Linger in January and February of 2016 with reports of feeling both up and down as well as feeling guilty about feeling like he could not go to work.  Tr. 557-572.  Hunt was afraid to go back to work because he felt he was making progress and he did not want to go back to what it had felt like for the past 20 years.  Tr. 568.

On March 8, 2016, Hunt relayed to Ms. Linger that he had "a pretty big dip over the past two weeks" and stayed in his room and avoided people for two weeks.  Tr. 573.  Throughout March and April 2016, Hunt continued to relay frustration with his ongoing cycling, worry over lack of finances, and lack of interest in being around others.  Tr.  577-604.  Hunt also saw Nurse Garrett on March 8, 2016.  Tr. 637-642.  She noted that Hunt was continuing to have mood swings with his last depression lasting two weeks.  Tr. 641.  Nurse Garrett recommended a daytime increase in the Depakote.  Tr. 641.   Hunt did not want to increase his medication because he felt it was causing an odor but he agreed to blood work to check his levels and to come in sooner if his depression worsened.  Tr. 641.

Hunt continued to attend counseling sessions with Ms. Linger during May and June 2016 with reports of both manic and depressive symptoms as well as ongoing irritability, frustration with other people, and an inability to focus.  Tr. 644-647, 649-668, 675-678.  Hunt saw Nurse Garrett on June 21, 2016.  Tr. 669-674.  Hunt reported that his mood was more stable and he did not want to make any medication changes.  Tr. 673.

During a July 12, 2016, visit with Ms. Linger, Hunt reported worrying about his aunt because of some conflict she was having in a relationship.  Tr. 679.  He was not feeling depressed or particularly manic.  Tr. 680.  He was occupying his mind by making repairs to his

18

camper.  Tr. 680.  Hunt's aunts had recently used his camper and had a really good time which made him happy.  Tr. 680.  The following week, Hunt was depressed and had been isolating himself.  Tr. 684.  When Hunt saw Ms. Linger on August 1, 2016, he expressed interest in trying to get out and be social at the skating rink but also expressed fear that he would be rejected.  Tr. 688.  On August 16, 2016, Hunt reported that he had forgotten to take his medication the day before and he was feeling "hyper."  Tr. 692.  During a session with Ms. Linger on August 30, 2016, Hunt relayed that he was stressed because his house was on the market.  Tr. 696.  He was having anxiety about people coming through the house, he was worrying about finances, he was having difficulty regulating his moods and isolating.  Tr.  697.

### 2.  Opinion evidence

#### a.  Treating psychiatrists/psychologists

On August 20, 2014, Ms. Varavvas and Dr. Fordyce encouraged Hunt "to make an application for disability given that he has tried outpatient therapy, medication and partial hospitalization to address his depression without significant benefit."  Tr. 279.  On September 2, 2014, Dr. Zaidi stated that Hunt "needs to be on disability."  Tr. 287.

#### b.  Consultative examiner

On April 2, 2015, Michael J. Harvan, Ph.D., met with Hunt and performed a psychological consultative evaluation.  Tr. 337-343.  In relating his chief complaint, Hunt indicated that he had held on while his mom was alive but, since her death, he felt it might be time for him to go.  Tr. 337.  Hunt indicated that, when he was working, sometimes he got along with others and sometimes he did not.  Tr. 339.  He relayed his past and current mental health treatment and reported that he was compliant with his medication.  Tr. 339.  He explained that, during a typical day, he would play Sudoku or Solitaire, visit with his aunt, and watch television.

19

Tr. 339.  He indicated that he was sleeping okay.  Tr. 339.  Hunt lived with his aunt in a house.

Tr. 339.  Hunt's aunt performed most of the household chores and shopping and Hunt mowed the

lawn.  Tr. 339.  He relayed that sometimes he would not leave the house for a few days.  Tr. 339-

340.  Hunt reported no hobbies or involvement in groups.  Tr. 340.

Dr. Harvan diagnosed Hunt with bipolar I disorder, moderate, most recent episode

depressed with anxious distress; generalized anxiety disorder; and other specified personality

disorder, paranoid features.  Tr. 341.  Dr. Harvan summarized his evaluation, stating that Hunt

showed symptoms of the diagnosed conditions; Hunt needed ongoing mental health treatment;

Hunt had almost no community support; Hunt had no friends; and Hunt had contact with his aunt

with whom he lived.  Tr. 341.

Dr. Harvan assessed Hunt's functional abilities, finding:

David displayed no limitation in the area of remote long-term memory functioning.
He displayed no limitation in the area of immediate long-term memory functioning.
He displayed no limitation in the area of short-term memory functioning.  He was
able to categorize at an average level. He interpreted proverbs and made adequate
judgments in practical problem-solving situations. David is likely to have no
significant difficulty understanding or remembering job instructions.

In regard to maintaining attention and concentration and maintaining persistence
and  pace to perform simple tasks and to perform multi-step tasks, the following is
noted. Though David was able to perform the A's test without error, followed
simple and more complex directions, repeated phrases without error and
solved single digit addition, subtraction,  multiplication problems and also a
problem in which he was required to make change, Michael did display some
symptoms of attention control problems.  He appeared to have difficulty when
directions seemed to be slightly more than very simple.  He seemed to have
difficulty grasping even simple directions immediately.  He asked for directions to
be repeated.  His pace of performance was thereby slowed.  He did persist at tasks
when encouraged.

In regard to responding appropriately to supervision and to coworkers in a work
setting, David indicated that he got along with a few peers in the school setting.  He
said that he tended to stay away from peers in a work environment.  He said he got
along with teachers.  He said he did what he was supposed to do when told by
supervisors.  He has no friends.  David is likely to have significant difficulty dealing

20

with fellow employees and supervisors in a work setting.  He does have paranoid thoughts and indicated that he does not trust people.

In regard to <u>responding appropriately to work pressures in a work setting</u>, currently, given his symptoms of bipolar disorder, which do not appear to be well treated, his difficulty dealing with others and difficulty focusing attention, David is likely to have significant difficulty responding appropriately to the pressures of a normal work environment.

Tr. 341-342 (emphasis in original).

### c.  Reviewing psychologists

On December 3, 2014, state agency reviewing psychologist Paul Tangeman, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 79-80) and Mental RFC Assessment (Tr. 81-82).  Dr. Tangeman found that Hunt had severe impairments of affective disorders and anxiety disorders.  Tr. 79.  In the PRT, Dr. Tangeman opined that Hunt had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of extended duration.  Tr. 80.   In the Mental RFC Assessment, Dr. Tangeman concluded that Hunt had no understanding and memory limitations and no adaptation limitations.  Tr. 81, 82.  In the area of sustained concentration and persistence, Dr. Tangeman concluded that Hunt was not significantly limited in most categories but he found that Hunt was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 81-82.  Dr. Tangeman provided further explanation, stating that Hunt was limited to simple to moderately complex tasks which would not require him to work at a constant pace and changes in duties should be infrequent and easily explained.  Tr. 82.  In the area of social interaction, Dr. Tangeman concluded that Hunt was not significantly limited in most categories but he found that Hunt was moderately limited in his

ability to interact appropriately with the general public and therefore Hunt would be limited to superficial interaction with the public.  Tr. 82.

Upon reconsideration, on April 9, 2015, state agency reviewing psychologist Robyn Murry-Hoffman, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 91-92) and Mental RFC Assessment (Tr. 93-95).   In addition to finding severe impairments of affective disorders and anxiety disorders, Dr. Murry-Hoffman also found personal disorders was a severe impairment.  Tr. 91.  Like Dr. Tangeman, Dr. Murry-Hoffman opined that Hunt had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of extended duration.  Tr. 92.  In the Mental RFC Assessment, Dr. Murry-Hoffman concluded that Hunt had no understanding and memory limitations.  Tr. 94.  In the area of sustained concentration and persistence, Dr. Murry-Hoffman concluded that Hunt was not significantly limited in most categories but he found that Hunt was moderately limited in his ability to maintain attention and concentration for extended periods and in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 94.  Dr. Murry-Hoffman provided further explanation, stating that Hunt would be limited to simple to moderately complex tasks which would not require him to work at a constant pace or complete strict production demands and changes in duties should be infrequent and easily explained.  Tr. 94.  In the area of social interaction, Dr. Murry-Hoffman concluded that Hunt was not significantly limited in most categories but he found that Hunt was moderately limited in his ability to interact appropriately with the general public and therefore Hunt would be limited to superficial interaction with the public.  Tr. 94.  Dr. Murry-Hoffman added that Hunt had some

intermittent history of problems with others but it had not resulted in significant problems.  Tr. 94-95.  In the area of adaptation, Dr. Murry-Hoffman concluded that Hunt was not significantly limited in most areas but Hunt was moderately limited in his ability to respond appropriately to changes in the work setting and therefore changes should be infrequent and easily explained.  Tr. 95.

## C.    Hearing testimony

### 1.    Plaintiff's testimony

Hunt was represented at and testified at the hearing.  Tr. 31-63, 73-74.   The ALJ asked Hunt to explain how his mental health issues affect him on a day-to-day basis.  Tr. 40.  Hunt explained that sometimes he is okay being around people and can leave his house to tend to his affairs and other times he is not okay being around people and cannot stand the idea of leaving his house.  Tr. 40.  Hunt indicated that his therapist has helped him with his panic attacks, noting that she has helped him to know when he needs to walk away.  Tr. 40-41, 57-58.  Along with people and stress, sunlight sometimes causes Hunt anxiety.  Tr. 43.  Different events make Hunt angry.  Tr. 43-44.  He never knows on a particular day what might anger him.  Tr. 43-44.  Hunt's anger causes him to act out verbally.  Tr. 43-44.  To drown out the outside world, Hunt will turn the television up loud or focus himself on a show.  Tr. 43-44.  Hunt's last panic attack occurred about six months prior to the hearing.  Tr. 41.  Hunt noted having PTSD based on abuse that occurred when he was a child.  Tr. 44-45.  Once during the year prior to the hearing, Hunt's depression caused him to isolate himself in his house for weeks at a time.  Tr. 45, 59-60.  He also experiences shorter periods of isolation.  Tr. 45-46.  During periods of depression, Hunt still continues to see his therapist, indicating his therapy sessions are the one connection he has to the

outside world during periods of depression.  Tr. 46.  Hunt also has periods of mania, which he estimated last for two or three weeks and occur three to four times per year.  Tr. 47-48.

He sees his counselor every week.  Tr. 41.  Hunt has been prescribed Depakote, Vistaril, and Celexa to help him with his anxiety, mood, and depression.  Tr. 42.  Hunt's medication has caused some body odor.  Tr. 62.  He has not noticed other side effects from his medication.  Tr. 62.  Hunt is not sure that his medication helps but his therapist has told him that she believes that the medication is helping because he is making progress and learning.  Tr. 48.  Hunt noted that he does not like putting medication in his body and feels that not being bound to a schedule is what has allowed him to have some quality of life.  Tr. 48.

Hunt no longer drinks alcohol on a regular basis.  Tr. 49-50.  In the past, Hunt had used alcohol as a method of self-medicating but was no longer doing so.  Tr. 49-51.  Hunt indicated that he does not sleep regularly and, even when he gets six or seven hours of sleep at night, he still naps.  Tr. 51-52.  During the day, Hunt watches a lot of television.  Tr. 52.  Sometimes he just has the television on for noise.  Tr. 52.  Hunt is on the internet during the day or might play Solitaire.  Tr. 52.  Hunt only reads if he is researching something.  Tr. 52.  He does not read for pleasure.  Tr. 52-53.  Hunt is generally able to take care of his own personal needs and hygiene.  Tr. 53.  At times, Hunt's aunt has to encourage him to take a shower because Hunt feels it is a daunting task.  Tr. 53.  Hunt's aunt usually takes care of the indoor household chores, like cooking, cleaning and laundry, and Hunt takes care of the heavier, outdoor chores, like mowing the yard and trash.  Tr. 53.  Hunt goes roller skating once a week on his own.  Tr. 53-54.  Sometimes Hunt socializes when he goes roller skating and other times he does not.  Tr. 54.  Hunt gets some enjoyment from working on household projects.  Tr. 54.  Other than his aunt,

Hunt does not have friends or family that he talks to on a regular basis.  Tr. 54-55.  Hunt has a cat that he helps take care of.  Tr. 55.

Hunt indicated he spent the prior 10 years wishing he was dead but he has not acted on those thoughts.  Tr. 57.  When Hunt has gotten really angry, he has had fleeting thoughts of harming others but he has never acted on them and never wants to hurt anyone.  Tr. 57.  Hunt's mental health symptoms affect his ability to focus.  Tr. 60.  His inability to focus tends to be worse when he is experiencing depressive as opposed to manic symptoms.  Tr. 60.  Hunt indicated it is difficult for him to make plans, such as agreeing to help someone or picking up a side job, because he does not know what any given day will be like.  Tr. 61.

When Hunt was employed, there were times when, due to his mental health symptoms, he would nap in the middle of the day if he could get away with it.  Tr. 58.  He never had an employer reprimand him or fire him because of his mental health symptoms.  Tr. 58.  One time Hunt told his employer that he needed to quit and his employer gave him time to take care of what he needed to do so he could get back to work.  Tr. 58-59.  In that instance, he was off of work for about two weeks.  Tr. 59.

### 2.  Vocational expert's testimony

Vocational expert ("VE") Robert A. Mosley, Ph.D., testified at the hearing.  Tr. 63-73, 244-247.  The VE described Hunt's past work to include work as a furnace operator (a semi-skilled, heavy job); forklift operator (a semi-skilled, medium job, performed by Hunt at the medium to heavy level); inventory clerk (a semi-skilled, medium job, performed by Hunt at the light to medium level); and construction worker I (a semi-skilled, heavy job).  Tr. 65-66.

The ALJ and Hunt's counsel then posed various hypothetical questions to the VE.  Tr. 66-72.  In response to a hypothetical containing the limitations set forth in the RFC ultimately

25

assessed by the ALJ, the VE indicated that there would be jobs available for the individual described therein, including cleaner II (a medium, unskilled job); laborer, stores (a medium, unskilled job); and industrial cleaner (a medium, unskilled job).[6]  Tr. 67, 68-69.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[7] . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

---

[6] The VE provided national job incidence data for the identified jobs.  Tr. 67.

[7] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S.

Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC

and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his November 17, 2016, decision, the ALJ made the following findings:[8]

1. Hunt met the insured status requirements through September 30, 2016.  Tr. 12.

2. Hunt did not engage in substantial gainful activity during the period from his alleged onset date of February 28, 2013, through his date last insured of September 30, 2016.  Tr. 12.

3. Through the date last insured, Hunt had the following severe impairments: affective disorder (bipolar), anxiety disorder, and polysubstance abuse.  Tr. 12.

4. Through the date last insured, Hunt did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 12-13.

5. Through the date last insured, Hunt had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: Hunt is limited to simple, routine, and repetitive tasks but not

---

[8] The ALJ's findings are summarized.

at a production rate pace (i.e., assembly line work). Hunt is limited to simple work-related decisions. He can have occasional contact with supervisors, coworkers and the public. He is limited to tolerating few changes in a routine work setting. In addition to normal breaks, Hunt would be off task 10% of the time per 8-hour workday and absent from work one day per month. Tr. 14-17.

6.   Through the date last insured, Hunt was unable to perform any past relevant work. Tr. 17.

7.   Hunt was born in 1973 and was 42 years old, which is defined as a younger individual age 18-49, on the date last insured. Tr. 17.

8.   Hunt has at least a high school education and is able to communicate in English. Tr. 17.

9.   Transferability of job skills was not material to the determination of disability. Tr. 17.

10.  Through the date last insured, considering Hunt's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Hunt could have performed, including cleaner II, store laborer, and industrial cleaner. Tr. 17-18.

Based on the foregoing, the ALJ determined that Hunt was not under a disability at any time from February 28, 2013, the alleged onset date, through September 30, 2016, the date last insured. Tr. 18.

## V. Plaintiff's Arguments

First, Hunt argues that the ALJ erred in finding that Hunt's impairments did not satisfy Listing 12.04. Doc. 13, pp. 10-12. He contends that the he suffers from marked, rather than moderate, limitations in the areas of social functioning and concentration persistence or pace. Doc. 13, pp. 10-12.

Second, Hunt argues that the ALJ failed to fully consider and assign appropriate weight to the opinions of his treating psychiatrists/psychologists, Dr. Fordyce and Dr. Zaidi, and the consultative examiner, Dr. Harvan. Doc. 13, pp. 12-19.

## VI.     Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

## A.     The Court should find that the ALJ did not err at Step Three

Hunt argues that the ALJ erred at Step Three by finding that his mental impairments did not meet or equal Listing 12.04.  Doc. 13, pp. 10-12.  He contends that the ALJ improperly found

moderate rather than marked limitations in the areas of social functioning and concentration, persistence or pace.  Doc. 13, pp. 10-12.

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment(s) meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of establishing that his condition meets or equals a Listing.  *Thacker v. SSA*, 93 Fed. Appx. 725, 727-728 (6th Cir. Mar. 12, 2004) (citing *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).  Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker* 93 Fed. Appx. at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)).  "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing.'" *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. Apr. 1, 2011).  "A claimant must satisfy all the criteria to 'meet' the listing." *Id.*  "[A] claimant is also disabled if [his] impairment is the *medical equivalent* of a listing[.]" *Id.*  (emphasis in original).  There is no heightened articulation standard at Step Three.  *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411 (6th Cir. Jan. 31, 2006).

Listing 12.04 states:[9]

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

\*\*\*

---

[9] This version of Listing 12.04 was in effect at the time of the ALJ's November 17, 2016, decision.

    B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration; . . .[10]

20 C.F.R. § Pt. 404, Subpt. P, Appx. 1, Pt. A2 (effective 9/26/2016 to 1/16/2017).

At Step Three, the ALJ analyzed Hunt's mental impairments under Listing 12.04 and

concluded that Hunt's impairments did not satisfy the paragraph B criteria of Listing 12.04.  Tr.

12-13.   In assessing Hunt's impairment(s) under Listing 12.04, the ALJ stated the following

regarding the "paragraph B" criteria:

> In activities of daily living, the claimant had mild restriction. The claimant indicates that he lacks motivation (7E/4) but he does continue to care for himself (bathing, grooming, dressing), prepare/order simple meals and eat, do household chores and yard work, drive, and shop (4E/3-4; 6F/4-5; Testimony). He also helps care for a pet cat. (Testimony).
>
> In social functioning, the claimant had moderate difficulties. The claimant reports having no friends and strained relationships with former coworkers, finding most people "irritating and annoying" to the point that he avoids them, and being socially awkward. (3E/10; 4E/7). Yet, the claimant can still sometimes leave his home unaccompanied to shop in stores and go roller- skating. (4E/5-6; Testimony). He also spends time with his aunt (4E/6; 6F/4) and gets along with neighbors (6F/3).
>
> With regard to concentration, persistence or pace, the claimant had moderate difficulties. The claimant notes being easily frustrated, having his mind blank on him, and needing reminders for tasks. (3E/10; 4E/4, 7). However, his memory is sufficient enough to remember to care for himself, take his medications when needed, and go places. (4E/3-4, 6). He may need to reread instructions and does not do well under stress, but he is capable of concentrating enough on television programs, woodworking, reading, Sudoku, Solitaire, and his finances. (4E/6-8; 6F/4; Testimony). He even admit[] that he completes tasks. (4E/7).
>
> As for episodes of decompensation, the claimant had experienced no episodes of decompensation, which have been of extended duration.

Tr. 13.

---

[10] Hunt's challenge is not focused on Listing 12.04(A) or (C).  Accordingly, those sections are not quoted herein.

Hunt argues that the ALJ statements regarding Hunt's social limitations demonstrate more significant limitations. In particular, he argues that his lack of friends, strained relationships with former coworkers, and the fact that he finds most people irritating and annoying such that he avoids them shows more significant social limitations than those found by the ALJ. Doc. 13, pp. 10-11. Hunt also argues that the ALJ failed to identify certain treatment records, which he asserts show significant social anxiety, isolating behavior, and avoidant behavior, and support a finding of marked rather than moderate social limitations. Doc. 13, p. 11. "[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (*Loral Defense Systems–Akron v. N.L.R.B.,* 200 F.3d 436, 453 (6th Cir.1999)). The ALJ did not ignore Hunt's medical treatment history. Tr. 14-17. The ALJ acknowledged that Hunt struggled with fluctuations in his mood, social skills, and concentration and he found that Hunt had severe impairments of affective disorder (bipolar) and anxiety disorder.[11] Tr. 12, 16. The ALJ considered this evidence as well as evidence that Hunt went roller skating (weekly) and could shop on his own, spent time with his aunt, and got along with neighbors. Tr. 13, 206-208. Also, as noted by the ALJ, Hunt attended a party (Tr. 496), helped others (Tr. 516), and spent the Christmas holiday with his family (Tr. 553). Tr. 16.

Here, where it has not been shown that the ALJ failed to consider evidence, the undersigned finds that Hunt's argument amounts to a request that this Court consider the evidence anew. However, as indicated above, it is not for this Court "to try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. The ALJ sufficiently explained his findings regarding Hunt's social limitations and Hunt has not

---

[11] The ALJ also found polysubstance abuse was a severe impairment. Tr. 12.

shown that the ALJ's finding that Hunt's impairments caused moderate social limitations is not supported by substantial evidence.

Hunt also argues that the ALJ erred by concluding that his impairments caused only moderate rather than marked limitations in concentration, persistence or pace.  Doc. 13, pp. 11-12.  He contends that the ALJ's finding of a moderate limitation in this area did not take into account Hunt's inability to sustain persistence and pace necessary for substantial gainful employment and the ALJ focused primarily on the ability to concentrate.  Doc. 13, pp. 11-12.  Hunt argues that counseling records showing that Hunt struggled with concentration and focus and Dr. Harvan's consultative report support a finding of marked limitations in concentration, persistence or pace.  Doc. 13, pp. 12.

As with his social limitation argument, Hunt seeks to have this Court consider and weigh evidence that was considered and weighed by the ALJ.  That is not this Court's role.  The ALJ considered and weighed the opinion of Dr. Harvan.  Tr. 17.  Also, the ALJ discussed and considered Hunt's ability to concentrate on such things as television, woodworking, Sudoku, and Solitaire.  Tr. 13, 207, 339.  Also, the ALJ considered evidence that Hunt indicated he finishes what he starts and that he was able to work on projects at home, including repairing his camper and "gutting and rewiring" his house.  Tr. 13, 208, 493, 680.  Hunt has not shown that the ALJ's finding of moderate limitations is not supported by substantial evidence.  Additionally, in order to meet Listing 12.04(B), there must be at least two marked limitations.  As discussed above, Hunt has not shown error with respect to the ALJ's finding of moderate social limitations.  Thus, even if Hunt had evidence to support a finding of marked rather than moderate limitations in concentration, persistence or pace, reversal and remand would not be warranted.

For the reasons discussed herein, the undersigned recommends that the Court find no error with the ALJ's Step Three finding.

**B.      The Court should find that the ALJ did not err in evaluating the opinion evidence**

Hunt contends that the ALJ erred by failing to give proper weight to the opinions of his treating psychiatrists, Dr. Fordyce and Dr. Zaidi, and that the ALJ erred by assigning great weight to the opinion of the consultative examiner Dr. Harvan but failing to include Dr. Harvan's specific opinions in the RFC.

### 1.   Treating psychiatrists/psychologists

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).  An ALJ is not

obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when

weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th

Cir. Mar. 16, 2011).

The ALJ discussed the opinion rendered by Dr. Zaidi and explained his consideration of

and weight assigned to the opinion, stating:

> I also give less than great weight to the September 2014 opinion of Samina Zaidi,
> M.D. because, despite having a treating relationship with the claimant, her opinion
> that the claimant "needs to be on disability" is not supported by the claimant's
> noncompliance with treatment during 2014.  Indeed, at the time of Dr. Zaidi's
> opinion, the claimant had been off of his medication since months prior and, even
> when on his medication, he was taking a lower dose than he needed; the claimant
> was receiving prescriptions from his primary care physician rather than Dr. Zaidi
> or another mental health professional, and that physician was incorrectly
> medicating the claimant (4F/6) so it is reasonable to conclude that the claimant's
> symptoms would be exacerbated during this time.  Furthermore, Dr. Zaidi's opinion
> was given after the claimant had refused recommended treatment (inpatient-
> outpatient program), which suggests that the claimant's symptoms were not as
> severe as he relayed at the time.  (4F/6).

Tr. 15.

Additionally, the ALJ discussed the opinion rendered by Hunt's supervising psychologist

Dr. Fordyce and explained his consideration of and weight assigned to the opinion, stating:

> In fact, despite his therapist, Lisa Varavvas, M.A., and supervising psychologist,
> Barbara Fordyce, Ph.D., encouraging the claimant "to make an application for
> disability" (3F/2), I cannot give this October 2014[12] opinion great weight because
> it is inconsistent with the evidence of record existing at the time of the opinion.
> Ms. Varavvas and Dr. Fordyce conclude that the claimant did not receive
> significant benefit from the outpatient therapy, medication, and  partial
> hospitalization tried in the past but the claimant contributed to the failure of this
> treatment with noncompliance.  For example, the claimant began counseling with
> Ms. Varavvas in April 2012 but ceased participation in such in January 2013, just
> one month prior to his alleged onset date of disability. (see 1F/5).  He did not return
> for further counseling until much later in August 2014 and it appears that he did so
> only "to seek guidance relative to consideration of filing for disability."  (3F/2).
> So, this opinion is based on clinical observations and findings that predate the

---

[12] The cover sheet submitted with the opinion is dated October 2014.  Tr. 278.  The treatment summary refers to
counseling sessions in April 2012 through January 2013 and August 2014.  Tr. 279.

relevant alleged disability period in this case or on only a few months of treatment after the claimant returned for help with his claim for disability.

Tr. 14-15.

As Hunt acknowledges (Doc. 13, p. 13, n. 1), opinions that a claimant is disabled or unable to work are issues ultimately reserved to the Commissioner. 20 C.F.R. § 416.927(d). And, while treating source opinions on issues reserved to the Commissioner may not be ignored, such opinions are never entitled to controlling weight. *See* SSR 96–5p, 1996 WL 374183, * 2-3 (July 2, 1996); *see also Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx. 498, 505 (6th Cir. Oct. 15, 2013) ("If the treating physician . . . submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors—his decision need only explain the consideration given to the treating source's opinion." ) (internal quotations and citations omitted).

Here, there is no question that the opinion by Dr. Zaidi that Hunt "needs to be on disability" (Tr. 287) and Dr. Fordyce's statement in support of an application for disability (Tr. 279) are opinions on an issue reserved to the Commissioner, i.e., that Hunt was disabled. Hunt argues that the ALJ nevertheless failed in his evaluation of the opinions.

Hunt argues that the ALJ relied on evidence of noncompliance to provide less than great weight to Dr. Zaidi's opinion but did not analyze whether Hunt's noncompliance was justified based on his mental illness. Doc. 13, pp. 14-15. Hunt relies on *Ross v. Commr of Soc. Sec.*, 2013 WL 1284031 (N.D. Ohio Mar. 26, 2013) in making this argument. However, in *Ross*, the court rejected the plaintiff's argument that her non-compliance should be found justified based on her mental illness because she had not provided any evidence linking her mental illness to non-compliance. *Ross*, 2013 WL 1284031, * 13. Similarly, Hunt fails to explain a connection between or provide evidence linking his periods of non-compliance with his mental illness.

Hunt also cites to evidence in the record which he contends demonstrates that both opinions are supported by evidence in the record and therefore the ALJ erred in not assigning greater weight to the opinions.  However, the ALJ fully considered the evidence of record, including Hunt's treatment history, but found that Hunt's impairments were not as disabling as Hunt contended and that his doctors' opinions were not entitled to great weight.  Although Hunt disagrees with the ALJ's consideration and weighing of the evidence, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.  Furthermore, although Hunt contends that there is evidence to support his position, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477. Hunt has not shown that the ALJ ignored the opinions, that the ALJ failed to provide reasons for the weight assigned to both opinions, or that the ALJ's determination regarding Hunt's treating psychiatrists/psychologists' opinions is not supported by substantial evidence.

Based on the foregoing, the undersigned recommends that the Court find no error with the ALJ's consideration of the opinions of Dr. Zaidi and Dr. Fordyce.

### 2.  Consultative examiner

Hunt argues that the ALJ erred by assigning great weight to the opinion of consultative examiner Dr. Harvan but failing to include Dr. Harvan's specific opinions in the RFC.  Doc. 13, p. 17.  There is no dispute that the ALJ considered and weighed Dr. Harvan's consultative examining opinion.   The ALJ stated the following with respect to Dr. Harvan's opinion:

> I do afford the opinion of Michael Harvan, Ph.D., a consultative examiner, great weight in this case because it reflects the record as a whole in this case including the subjective reports and testimony of the claimant (6F).

Tr. 17.

Hunt argues that, although the ALJ assigned great weight to Dr. Harvan's opinion, the ALJ did not incorporate into the RFC Dr. Harvan's opinions that Hunt would have difficulty grasping even simple directions immediately; would have significant difficulty dealing with fellow employees and supervisors; and would have significant difficulty responding appropriately to the pressures of a normal work environment.  Doc. 13, p. 17 (citing Tr. 342).

The ALJ included the following mental limitations in Hunt's RFC assessment:

> [T]he claimant is limited to simple, routine, and repetitive tasks but not at a production rate pace (i.e., assembly line work).  He is limited to simple, work-related decisions.  He can have occasional contact with supervisors, coworkers, and the public.  He is limited to tolerating few changes in a routine work setting.  In addition to normal break, he would be off task 10% of the time per 8-hour workday and absent from work 1 day per month.

Tr. 14.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all the relevant evidence in your case record."  20 C.F.R. §§ 404.1545(a)(3), 404.1546(c).   The ALJ, not a physician, is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. Aug. 18, 2009).  In assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*  Thus, contrary to Hunt's suggestion, while the ALJ assigned great weight to Dr. Harvan's opinion, the ALJ was not required to incorporate the whole of Dr. Harvan's opinion into the RFC assessment.

Furthermore, Hunt has not shown that the mental RFC limitations do not adequately account for Dr. Harvan's opinion.  For example, the ALJ's RFC limits Hunt to simple, routine, and repetitive tasks but not at a production rate pace (i.e., assembly line work); simple, work-related decisions; and tolerating few changes in a routine work setting.  Tr. 14.  Hunt has not shown that these limitations do not adequately account for Dr. Harvan's opinions regarding Hunt's limitations regarding directions.  While Dr. Harvan opined that Hunt seemed to have difficulty grasping even simple directions immediately and had to ask for directions to be repeated, thereby slowing his pace of performance (Tr. 342), Dr. Harvan also opined that Hunt would likely have no significant difficultly understanding or remembering job instructions (Tr. 341).

Hunt also has not shown that the RFC, which limits Hunt to occasional contact with supervisors, coworkers, and the public, (Tr. 14), does not adequately take into account Dr. Harvan's opinion that Hunt would likely have significant difficulty dealing with fellow employees and supervisors in a work setting.  The ALJ recognized and accounted for the social limitations that he found supported by the record.

The ALJ's RFC also includes a restriction that Hunt would be off task 10% of the time and absent from work one day per month.  Tr. 14.  Hunt has not shown that this limitation, along with the other non-exertional RFC limitations, does not adequately take into account Dr. Harvan's opinion that Hunt would likely have significant difficulty responding to the pressures of a normal work environment.

For the reasons discussed herein, Hunt has not demonstrated error with respect to the ALJ's consideration of Dr. Harvan's opinion nor demonstrated that the ALJ failed to adequately account for limitations contained in Dr. Harvan's opinion when formulating Hunt's mental RFC.

Accordingly, the undersigned recommends that the Court find no error with respect to the ALJ's consideration of Dr. Harvan's opinion.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

September 25, 2018                                    */s/ Kathleen B. Burke*
                                                     Kathleen B. Burke
                                                     United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).